**In the Matter of the INVOLUNTARY DISCHARGE OR TRANSFER OF J.S. BY Ebenezer HALL.**

**No. C6–93–1718.**

Court of Appeals of Minnesota.

March 1, 1994.

Mark S. Larson, Peter D. Magnuson, Messerli & Kramer, Minneapolis, for relator Ebenezer Hall.

Laurie Hanson, Laurie N. Davison, Law Offices of the Legal Aid Soc. of Minneapolis, Inc., Minneapolis, for respondent J.S.

Hubert H. Humphrey, III, Atty. Gen., Maria C. Christu, Asst. Atty. Gen., St. Paul, for respondent Minnesota Com'r of Health.

Considered and decided by AMUNDSON, P.J., and SCHUMACHER and FLEMING *, JJ.

## OPINION

AMUNDSON, Judge.

A nursing care facility challenges the Commissioner of Health's decision that it cannot involuntarily transfer or discharge a resident. We affirm.

## FACTS

Respondent J.S. is a 74-year-old woman with a history of mental illness dating back to the 1940s. She has been diagnosed with chronic schizophrenia, paranoid type.[1] J.S.'s immediate family is limited to two elderly brothers who are unwilling or unable to participate in her care.

Relator Ebenezer Hall (Ebenezer) is a nursing facility licensed by the state and certified for participation in the Medicaid program, and is subject to all state and federal requirements regarding the provision of care. Ebenezer is owned by the Ebenezer Society, a Minnesota nonprofit corporation. Ebenezer provides basic geriatric nursing care and services. Ebenezer asserts that it is not staffed or equipped to meet the needs of a resident with an unstabilized mental illness.[2]

J.S. was admitted to Ebenezer on February 24, 1989 for treatment of a leg ulcer and for basic nursing care. The preadmission screening form indicated that J.S.'s mental illness was "no consideration."

J.S. has resided in nursing facilities for approximately 20 years. Most recently, J.S. resided at the Angelus Convalescent Center, n/k/a Regina Terrace Nursing Home, but was discharged in January 1989 due to "unrelenting behavioral and treatment problems." Immediately prior to being admitted at Ebenezer, J.S. was admitted to inpatient psychiatry at Metropolitan Mount Sinai Center for control of her behavior. J.S.'s independence is important to her and she tries to manage her own medical care, finances and diet.

Ebenezer's efforts to accommodate J.S.'s needs have been mostly unsuccessful. Since her admission to Ebenezer, J.S. has received virtually no treatment for her mental illness from psychiatrists or other mental health professionals because she has refused treatment. J.S.'s need to exclude staff and control her own health care is part of her mental illness.

J.S. was treated for many years by Dr. Wyatt Moe, a licensed psychiatrist. Dr. Moe began treating J.S. in 1971 and remained responsible for her care until the spring of 1989. Shortly after her transfer to Ebenezer, J.S. refused to take Haldol, a psychotropic medication, as prescribed by Dr. Moe.[3] She also refused to have any further contact with Dr. Moe. J.S. was taking Xanax, a minor tranquilizer, but this medication was discontinued in 1991.

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

1. J.S. does not fit the classic diagnosis of schizophrenia. She does not exhibit delusions or give indications of bizarre fragmented delusions. J.S. is not confused or disoriented. She does exhibit what is known as a contrary or oppositional personality which means that she will determine her own rules and follow them. J.S.'s oppositional personality, when combined with her paranoid disorder, often results in a negative reaction to nursing home staff and residents. J.S. generally refuses to accept alternate explanations about her interpretations of activities going on around her.

2. Ebenezer states that it does have several other mentally ill residents but their conditions are stabilized through medical treatment and physician supervision.

3. Dr. Moe prescribed Haldol for J.S. on March 13, 1989. The nurses at Ebenezer offered the medication to her twice a day until April 4, 1989. J.S. refused each time and the order was discontinued. Haldol was again prescribed for J.S. on December 13, 1991. The medication was offered to J.S. every day for fourteen days but she refused each time. It appears, however, that J.S. had a particular aversion to Haldol and its side effects. Apparently no attempt was made to determine why J.S. refused Haldol or whether she would agree to any alternative medication.

At various times, J.S. has neglected her personal health, including hygiene, nutrition, and treatment for her leg ulcer. J.S. also refuses to maintain a relationship with a primary physician for her medical needs. J.S. has had contact with a variety of doctors, but usually on a one-time basis. J.S. refuses to continue with a particular physician if that physician has any contact with Ebenezer nursing staff. She also refuses to keep Ebenezer staff informed about when she seeks care from a physician or about any treatment she receives.

This refusal of medical treatment has at times posed a threat to J.S.'s personal well-being. Ebenezer's medical director, Dr. Thomas Von Sternberg, testified before the Administrative Law Judge (ALJ) that J.S.'s continued refusal to accept treatment is likely to have an adverse effect on her cardiovascular system and medical welfare. However, her physical and mental condition have not deteriorated during her stay at Ebenezer.

It is undisputed that J.S. is in need of continuing psychiatric treatment to control her mental illness. J.S. does not respond to the staff's attempts to redirect or control her behavior. Although she has not actually physically harmed anyone, Ebenezer contends her behavior endangers the safety of other residents.

On May 11, 1992, Ebenezer served a notice of discharge on J.S. An amendment to the notice of discharge was served on J.S. on July 6, 1992. The amendment stated the following reasons for discharge:

1. The discharge is necessary for Resident's welfare and Resident's needs cannot be met at Ebenezer Hall * * *. [H]er behavior is endangering her health and is likely to worsen her mental illness. Ebenezer Hall is not equipped to care for unstabilized mentally ill residents; other facilities are better able to do so.[4]

2. The safety of individuals at Ebenezer Hall is endangered * * *. Her violent, abusive behavior to frail elderly and infirm

residents puts them at risk. She will not accept staff intervention.

J.S. appealed the notice of discharge, and hearings were held before an ALJ. The ALJ issued an order, concluding that: (1) the transfer or discharge of J.S. is necessary for her welfare and that her needs cannot be met at Ebenezer; (2) J.S. endangers the safety of other residents at the facility; and (3) alternative placements exist which would better suit J.S.'s needs. Based on these conclusions, the ALJ recommended that J.S.'s involuntary discharge appeal be denied.

The Commissioner of Health rejected the ALJ's recommendation and denied Ebenezer's request to involuntarily discharge or transfer J.S. The Commissioner concluded that Ebenezer had not established by a preponderance of the evidence that either the transfer or discharge of J.S. is necessary for her welfare and that her needs cannot be met in the facility, or that J.S. endangers the safety of other individuals in the facility.

The matter is now before this court on Ebenezer's certiorari appeal from the Commissioner's decision.

## ISSUE

Did the Commissioner of Health err in determining that Ebenezer Hall failed to meet its burden to establish a basis for the involuntary transfer or discharge of J.S.?

## ANALYSIS

### I. Standard of Review

Decisions of administrative agencies enjoy a presumption of correctness, and deference should be shown by courts to an agency's expertise and special knowledge in the field of its technical training, education and experience. *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 824 (Minn.1977).

In a judicial review of an administrative agency decision, this court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or

---

4. Ebenezer has proposed that J.S. be transferred or discharged to the Queens Care Center. Ebenezer states that the Queens Care Center has special programs to meet the needs of mentally ill residents and has agreed to accept J.S. as a resident once the appropriate paperwork has been completed.

modify the decision if the "substantial rights of the petitioners may have been prejudiced" because the administrative findings, inferences, conclusions or decision are "[u]nsupported by substantial evidence in view of the entire record" or are "[a]rbitrary or capricious." Minn.Stat. § 14.69 (1992).

"Substantial evidence" is: (1) such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; (2) more than a scintilla of evidence; (3) more than "some evidence"; (4) more than "any evidence"; and (5) evidence considered in its entirety. *Reserve Mining,* 256 N.W.2d at 825.

An agency decision may be arbitrary or capricious if the decision represents the agency's will and not its judgment. *Markwardt v. State, Water Resources Bd.,* 254 N.W.2d 371, 374 (Minn.1977).

## II. *Statutory Background*

Amendments to the Social Security Act contained in the Omnibus Budget Reconciliation Act (OBRA) of 1987 significantly affected the rights of residents in nursing facilities. *See* Pub.L. No. 100–203, 101 Stat. 1330 (1987); *see also* 42 C.F.R. pt. 483 (1991) (regulations for implementing OBRA).

In general, nursing facilities must support individual needs and preferences and promote or maintain the highest quality of life and the highest practicable physical, mental and psychosocial well-being of each resident. *See* 42 U.S.C. §§ 1396r(b)(1)(A), (2); 42 U.S.C. §§ 1395i–3(b)(1)(A), (2).

■ A nursing facility must initially and periodically conduct a comprehensive assessment of each resident's functional capacity. 42 C.F.R. § 483.20. Additionally, a nursing facility must develop a comprehensive care plan for each resident that includes "measurable objectives and timetables to meet a resident's medical, nursing, and mental and psychosocial needs" that are identified in the comprehensive assessment. *Id.,* § 483.-20(d)(1).

■ OBRA contains a provision known as PASARR (Preadmission Screening and Annual Resident Review), which was enacted to ensure that persons with mental illness, mental retardation or related conditions are not inappropriately admitted to or retained in a nursing facility and to ensure that persons in nursing facilities get the services they need. *See* 42 U.S.C. § 1396r(e)(7). The PASARR process became effective in January 1, 1989. *Id.* § 1396r(e)(7)(A)(i). Final regulations implementing PASARR were published in November 1992. *See* 57 Fed.Reg. 56,450–514 (1992).

PASARR requires states to: (1) screen all mentally ill individuals prior to their nursing home admission to determine whether the individual needs the level of care provided by the nursing facility; (2) review and determine at least annually whether the resident, because of the resident's physical and mental condition, requires the level of services provided by a nursing facility or requires the level of services of an inpatient psychiatric hospital for individuals under age 21 or of an institution for "mental diseases" providing medical assistance to individuals 65 years of age or older; (3) review and determine at least annually whether nursing facility residents need "specialized services" [5] for mental illness. 42 U.S.C. § 1396r(e)(7).

The state must provide or arrange for the provision of "specialized services" to all nurs-

---

5. For mental illness, "specialized services" means

the services specified by the State which, combined with services provided by the NF [nursing facility], results in the continuous and aggressive implementation of an individualized plan of care that—
　(i) Is developed and supervised by an interdisciplinary team, which includes a physician, qualified mental health professionals and, as appropriate, other professionals.
　(ii) Prescribes specific therapies and activities for the treatment of persons experiencing an acute episode of serious mental illness, which necessitates supervision by trained mental health personnel; and
　(iii) Is directed toward diagnosing and reducing the resident's behavioral symptoms that necessitated institutionalization, improving his or her level of independent functioning, and achieving a functioning level that permits reduction in the intensity of mental health services to below the level of specialized services at the earliest possible time.
57 Fed.Reg. 56,509 (1992) (to be codified at 42 C.F.R. § 483.120(a)).

ing facility residents with mental illness whose needs are such that "continuous supervision, treatment and training by qualified mental health * * * personnel is necessary." 57 Fed.Reg. 56,509–510 (1992) (to be codified at 42 C.F.R. § 483.120(b)).[6]

A nursing facility must issue the resident a notice of transfer or discharge at least 30 days before the resident is transferred or discharged. 42 C.F.R. § 483.12(a)(5)(i). The notice must contain the reasons for the transfer or discharge and inform the resident of the right to contest the proposed action. 42 C.F.R. § 483.12(a)(6).[7] The Minnesota Commissioner of Health is required to provide hearings for appeals of transfers or discharges from nursing homes. Minn.Stat. § 144A.135 (1990).

■ Each nursing facility resident has the right not to be transferred or discharged involuntarily unless certain substantive and due process criteria are met. 42 C.F.R. § 483.12. A resident may not be transferred or discharged unless:

(i) The transfer or discharge is necessary for the resident's welfare and the resident's needs cannot be met in the facility;

(ii) The transfer or discharge is appropriate because the resident's health has improved sufficiently so the resident no longer needs the services provided by the facility;

(iii) The safety of individuals in the facility is endangered;

(iv) The health of individuals in the facility would otherwise be endangered;

(v) The resident has failed, after reasonable and appropriate notice, to pay for * * * a stay at the facility. * * *; or

(vi) The facility ceases to operate.

42 C.F.R. § 483.12(a)(2).

Ebenezer seeks to transfer or discharge J.S. under paragraphs (a)(2)(i) and (a)(2)(iii). Proof of either reason would support the transfer or discharge. *See id.* The basis for transfer or discharge must be documented in the resident's clinical record. 42 C.F.R. § 483.12(a)(3).[8] A nursing facility proposing to transfer or discharge a resident must prove the supporting facts by a preponderance of the evidence. *See* Minn.R. 1400.7300, subpt. 5 (1991).

### III. *Welfare and Needs of J.S.*

Ebenezer contends that it demonstrated in detail its inability to meet J.S.'s needs, arguing that: (1) J.S. persistently refused treatment of her mental illness, including psychiatric supervision and medication; and (2) it is not equipped to take care of a resident with an unstabilized mental illness.

■ Under federal regulations and the nursing facility resident's Bill of Rights, a resident has the right to refuse treatment. *See* 42 C.F.R. § 483.10(b)(4); Minn.Stat. § 144.651, subd. 12 (1990). The interpretative guidelines of the Health Care Financing Agency (HCFA), the agency responsible for implementing OBRA, provide that a refusal of treatment does not absolve a nursing facility from providing the care necessary to allow a resident to attain or maintain his or her highest physical, mental and psychosocial well-being. *State Operations Manual,*

---

**6.** In 1991, screenings under the PASARR process were conducted for J.S. The evaluators determined that J.S. required the level of services provided by a nursing home but was not in need of "specialized services."

**7.** At the time of the Commissioner's decision, "transfer" and "discharge" were defined to include the "movement of a resident to a bed outside of the certified facility." 42 C.F.R. § 483.12(a)(1).

Recent regulations, however, clarify the distinction between the terms "transfer" and "discharge." A "transfer" is the movement of a resident from a skilled nursing facility "to anoth-

er institutional setting." 57 Fed.Reg. 56,514 (1992) (to be codified at 42 C.F.R. § 483.202). A discharge is the movement of a resident from a skilled nursing facility "to a noninstitutional setting." *Id.* Because Ebenezer has proposed that J.S. be moved to a mental health facility or other specialized facility, this proceeding is concerned with a "transfer" rather than a "discharge."

**8.** When a facility transfers or discharges a resident under paragraph (a)(2)(i), the documentation must be made by the resident's physician. 42 C.F.R. § 483(a)(3)(i). The regulations do not specify who must make the documentation when a facility transfers or discharges a resident under paragraph (a)(2)(iii).

Transmittal No. 250 (Dept. of Health & Human Servs., Health Care Financing Admin. Apr. 1992). Additionally, a facility may not discharge a resident for only refusing treatment. The discharge criteria must also be met. *Id.*

■ Because J.S. had a right to refuse treatment, we inquire whether Ebenezer fulfilled its duty under federal and state law to provide mental health services to J.S.

Ebenezer did undertake various efforts to help J.S. obtain care for her mental illness. Ebenezer attempted to involve Dr. Moe in J.S.'s care, but she refused. In December 1989, Ebenezer arranged for Dr. Bruce Hiller, a psychiatrist with the Hennepin County Mental Health Center Nursing Home Consultation Project, to evaluate J.S. Dr. Hiller concluded:

[P]roper treatment is going to be significantly impaired by her refusal to take what probably is most indicated, one of the neuroleptic type medications. [J.S.] * * * would not be a candidate for forcing medications involuntarily in spite of her symptomology. * * * I do not have any specific recommendation for a distinct medication change here that I think is apt to be clearly beneficial. I would favor continuation of the present schedule and try to manage as best as possible. If the management problems become intolerable, a change in facility may be the most definitive management that could be offered at this time.

Ebenezer has also attempted to improve her mental health by involving J.S. in social services, activities programs and recreational therapies. For example, Ebenezer consulted with the Hennepin County Mental Health Program and a consulting psychologist regarding methods for dealing with J.S.

In February 1990, Ebenezer filed a report with the Adult Protection Division of Hennepin County. Adult Protection responded that it would not intervene because the situation was not life threatening. Ebenezer contacted the Minnesota Medical Decision Advocate Program in February 1991, but J.S. refused assistance in finding appropriate care. In February and March 1991, J.S. did not follow through with representatives from the Minnesota Alliance in obtaining appropriate care. In the spring of 1992, J.S. again refused Ebenezer's attempts to help her find a physician of her choosing. J.S. also refused on several occasions to be examined by Ebenezer's medical director.

In preparation for the hearing before the ALJ, J.S. was examined by Dr. Seymour Z. Gross, Ph.D., Director of the Pilot City Mental Health Center. Although Dr. Gross questioned whether Ebenezer staff had tried all available options in dealing with J.S., he suggested no approach that had not already been attempted. Dr. Gross did not discount the conclusion of others that J.S. needs a major antipsychotic medication to control her paranoia and personality.

The Commissioner stated that the main concern in this case is Ebenezer's "shortcomings with respect to J.S.'s comprehensive assessment and care plan." The Commissioner also stated that Ebenezer did not meet OBRA regulations because there was no documentation that a psychologist, psychiatrist or other licensed mental health provider participated in an assessment or had been consulted to advise Ebenezer on alternative modalities of treatment for J.S. Additionally, the Commissioner determined that Ebenezer had not pursued either PASARR "specialized services" for J.S. or an incompetency adjudication to force J.S. to take medication.

Acknowledging the difficulties in dealing with J.S.'s behavior, the Commissioner stated that involuntary discharge would set a "dangerous precedent" by allowing facilities to discharge residents rather than trying alternative modalities of treatment for mentally ill residents. Ebenezer, however, contends the Commissioner's position forces all nursing facilities to futile extremes by requiring a comprehensive treatment program for major mental disorders before transferring or discharging mentally ill residents.

Nothing in the record indicates that J.S. needs "specialized services" or that civil commitment would be appropriate. Under federal regulations, however, Ebenezer "must provide" mental health services which are of a lesser intensity than "specialized services" to all residents who need such services. 57

Fed.Reg. 56,510 (1992) (to be codified at 42 C.F.R. § 483.120(c)). J.S.'s special needs present a problem to Ebenezer. Under OBRA regulations, however, Ebenezer cannot transfer or discharge J.S. without first trying to provide the required services. Although Ebenezer did make some attempts to get J.S. mental health services, the Commissioner determined that Ebenezer's attempts fell short of providing a plan of care and treatment for J.S.'s mental health needs.

This is a close case. Under the narrow standard of review operative here, however, we are compelled to affirm the Commissioner's determination that Ebenezer failed to prove by a preponderance of the evidence that the transfer or discharge of J.S. was necessary for her welfare and that her needs could not be met in the facility.

■ Following a comprehensive assessment of a resident's needs, a nursing facility is required to develop a comprehensive care plan to meet the resident's medical, nursing, mental and psychosocial needs. 42 C.F.R. § 483.20(d). Ebenezer did not introduce adequately documented evidence that it properly assessed J.S.'s mental and physical health or that it developed a care plan for J.S. with appropriate mental health professionals. It is not enough for Ebenezer to hypothesize that a care plan would have been futile. Rather, Ebenezer must show through clinical evidence that a negative outcome was unavoidable.

■ The involuntary transfer or discharge of a nursing facility resident must be the last resort. A facility must first exhaust the options available to it within the level of care it is authorized to provide. In the absence of the comprehensive evaluation of a resident's condition and needs, the nursing facility is not entitled to elect the final option, involuntary transfer or discharge of the resident. *E.g., In re George Brown,* 91–OAD–090–3 at 10 (D.C. Dep't of Consumer & Regulatory Affairs 1992).

Because Ebenezer has not exhausted its options in this case, it must now develop a proper care plan with input from mental health professionals to utilize behavioral management techniques for J.S.'s behavior problems. If members of Ebenezer staff have a better understanding of J.S.'s mental condition and needs through an assessment and care plan, they might be able to reduce the frequency of J.S.'s problem behaviors substantially.

J.S. might refuse any treatment, but that does not change Ebenezer's obligation to develop a comprehensive care plan. Ebenezer need not now establish a comprehensive treatment program to deal with major mental disorders. Ebenezer need only properly assess the resident's needs and develop a comprehensive care plan with input from mental health professionals.

What specific services are included in mental health services of lesser intensity than "specialized services" must be clarified. The HCFA, however, has declined to describe in detail all the services that are needed to meet the mental health rehabilitation needs of nursing facility residents. *See* 57 Fed. Reg. 56, 479–480 (1992). The HCFA noted that specific definitions are not appropriate because the nature of the services may vary depending on the specific need of a particular individual. *Id.* at 56,480. Thus, we are unable to specify with particularity the mental health services that a nursing facility must provide to mentally ill residents.

The evidence in the record supports the Commissioner's determination that Ebenezer did not implement an adequate comprehensive care plan. Accordingly, the Commissioner's decision that Ebenezer has not established by a preponderance of the evidence that transfer or discharge of J.S. is necessary to her welfare and that her needs cannot be met in the facility is supported by substantial evidence and is not arbitrary or capricious.

## IV. *Safety*

Even if Ebenezer failed to prove transfer of J.S. was necessary for her welfare or that it could not meet her needs, Ebenezer could still discharge J.S. by proving that she endangers the safety of individuals in the facility. *See* 42 C.F.R. 483.12(a)(2)(iii).

The most pronounced manifestation of J.S.'s mental illness is her repeated verbal abuse of Ebenezer staff and residents. Dur-

ing such episodes, J.S. is anxious, agitated, and sometimes physically threatening. The level of verbal abuse appears to vary with her stress level, which also appears to vary with the degree to which the nursing home staff attempts to actively manage her behavior and condition. Although J.S. has not physically assaulted Ebenezer staff or residents, the ALJ found that J.S.'s behavior creates "a reasonable fear of a physical confrontation."

For example, on two occasions J.S. entered the room of a 100–year–old legally blind man between 2:00 a.m. and 3:00 a.m. and began screaming obscenities and making threatening gestures. She accused the man of running a prostitution ring involving the nursing staff out of his room. The man was required to leave his room and sleep elsewhere in the facility. On another occasion, J.S. came into the television lounge, changed the channel and called another resident a "dumb bitch." When the nurse told J.S. she should watch a different television, J.S. responded, "What in the hell for? I live here damn it, and this one's the closest to my room. You're nothing but a f—ing bitch." J.S. has been verbally abusive to other residents and accuses them of talking about her. J.S. walks into other residents' rooms and takes things. The only physical confrontation occurred when J.S. pushed another resident in a wheelchair into a nurses' desk.

Ebenezer's medical director, Dr. Von Sternberg, testified before the ALJ that J.S.'s verbal behavior, particularly when combined with threatening gestures, endangers the safety of frail, elderly residents who have limited coping abilities. The Commissioner, however, concluded that the record contains "insufficient evidence of endangerment to the health or safety of others."[9]

■ It is difficult to believe that OBRA requires that another resident must be physically harmed or suffer a serious adverse reaction before there is a finding of endangerment. Thus, we find it difficult to ignore Dr. Von Sternberg's testimony of endangerment. Nevertheless, under the narrow standard of review, we are compelled to affirm the Commissioner's determination that Ebenezer failed to prove by a preponderance of the evidence that the safety of individuals in the facility is endangered.

■ We agree with the Commissioner's reasoning that Ebenezer has not demonstrated that it created an appropriate assessment or comprehensive care plan which would identify options geared for J.S.'s particular needs and the protection of other individuals in the facility. As we previously determined, under federal regulations, Ebenezer did not adequately develop a comprehensive care plan with input from mental health professionals that was sufficient to meet J.S.'s needs.

In the absence of a comprehensive care plan identifying ameliorative options to control J.S.'s behavior, Ebenezer cannot involuntarily discharge or transfer J.S. for safety reasons. Therefore, the Commissioner's determination that J.S. does not endanger the safety of individual in the facility is supported by substantial evidence and is not arbitrary or capricious.

### DECISION

The Commissioner of Health did not err in determining that Ebenezer Hall failed to establish adequate grounds for the involuntary transfer or discharge of J.S.

**Affirmed.**

9. As support for her decision, the Commissioner cites six previous involuntary transfer or discharge cases wherein she·found that the facility failed to meet its burden of proof in regard to endangerment. In four of the cases, the resident had been physically assaultive on repeated occasions, and had caused injuries to other residents and staff.

While other cases decided by the Commissioner have involved more egregious conduct than in this case, without a finding of endangerment, there was never a court order suggesting that any of the cases were properly decided. Therefore, the Commissioner's previous decisions are not controlling in this case.